James S. Christian, State Bar No. 023614
**CHRISTIAN GOODMAN PLC**
5050 North 40th Street
Suite 320
Phoenix, Arizona 85018
Telephone:  (602) 899-4711
Enail:  James@Christian-Goodman.com

*Liaison Counsel for Plaintiff*

Timothy Brown (*pro hac vice* forthcoming)
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Chase Manley, derivatively and on behalf of Taronis Technologies, Inc., f/k/a MagneGas Applied Technology Solutions, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> Scott Mahoney; Robert L. Dingess; Kevin Pollack; Ermanno P. Santilli; and William W. Staunton, <br><br> Defendants, <br><br> and <br><br> Taronis Technologies, Inc., f/k/a MagneGas Applied Technology Solutions, Inc., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Chase Manley ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Taronis Technologies, Inc., f/k/a MagneGas Applied Technology Solutions, Inc. ("Taronis" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Scott Mahoney, Robert L. Dingess, Kevin Pollack, Ermanno P. Santilli, and William W. Staunton (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As and for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action, brought for the benefit of Nominal Defendant Taronis, which seeks to remedy wrongdoing committed by Taronis' current and/or former directors and officers from at least January 28, 2019 through the present (the "Relevant Period").

2.      Taronis is a technology-based company that purports to specialize in alternative natural resource solutions to address fuel and water constraints. The Company had two main technology applications, renewable fuel gasification and water decontamination/sterilization.  Taronis provides gases, cutting fuels, and other supplies to customers in the welding industry. Among its products is "MagneGas", a metal cutting fuel alternative to acetylene, a commonly used non-renewable fossil-fuel based metal

cutting fuel. MagneGas is touted to be "a cleaner, renewable fuel alternative that creates a flame up to 85% hotter than acetylene and cuts metal up to 38% faster . . . while maintaining a comparable price."

3. Prior to the Relevant Period, the Company's shares fared poorly on the stock market. On May 7, 2018, NASDAQ Stock Exchange ("NASDAQ") officials informed the Company that if the Company did not raise its stock price above NASDAQ's $1.00 minimum by November 5, 2018, the Company would be delisted from NASDAQ.

4. Although the Company was able to obtain an extension of this deadline to May 6, 2019, the Company's Board of Directors (the "Board") determined that the Company would not be able to regain compliance with NASDAQ's minimum stock price without taking certain drastic measures.

5. During this period of time, the Individual Defendants devised a scheme to artificially raise the price of the Company's stock by making certain false and misleading statements concerning a contract between the Company and the City of San Diego for the sale of the Company's "MagneGas2" cutting fuel.

6. This purported contract between the Company and the City of San Diego was, in fact, completely fabricated by the Individual Defendants. No such contract existed during the Relevant Period, nor had one previously existed between the Company and the City of San Diego.

7. On January 28, 2019, the Company announced this purported contract in a current report filed with the SEC on Form 8-K (the "January 28 8-K"). Attached as an exhibit to the January 28 8-K was a press release issued by the Company touting, *inter alia*, this supposed "first major city contract" adopting the Company's metal fuels (the "January 28 Press Release"). As news of this seemingly significant development circulated, the price of the Company's stock increased dramatically, closing at $4.74 per share that day, up from $4.00 per share at close on the previous business day, January 25,

3

2019.[1]

8.     As evidenced by a number of internal emails exchanged between City of San Diego officials that day, the City of San Diego was shocked by the announcement of this purported contract.

9.     A day later, on January 29, 2019, after exchanging emails with Company representatives, a City of San Diego official forced the Company to remove the January 28 Press Release from the Company's website.

10.     That same day, in another attempt to raise the price of the Company's stock, the Company enacted a planned reverse stock split that would consolidate every 20 shares of the Company's stock into 1 share at the close of business on January 30, 2019.

11.     On January 31, 2019, the Company held a conference call to discuss the Company's latest business strategy with investors. During the call, Defendant Mahoney made no mention of the communications exchanged between City of San Diego officials and the Company just days earlier, which had resulted in the Company being forced to remove the January 28 Press Release from the Company's website. Analysts and investors were eager to discuss Taronis' new material development. Despite Defendant Mahoney knowing full well that the previously touted contract did not exist, he failed to correct analysts' impressions at the conference call regarding the contract between the Company and the City of San Diego. In fact, in response to a blatant statement about the Company's progress in connection with the purported contract, Defendant Mahoney merely stated "thank you[,]" explicitly choosing to refrain from correcting the analysts' notion of the Company's arrangement—or lack thereof—with the City of San Diego.

12.     In the days after the January 28 Press Release was pulled, uncertainty surrounding the Company and its representations began to circulate through the market. As a last-ditch attempt to to rehabilitate its rapidly deteriorating image, the Company rebranded itself as Taronis Technologies, Inc. on January 31, 2019.

---

[1] Adjusted for the Company's 20:1 reverse stock split at the close of business on January 30, 2019.

13.     On February 1, 2019, the price of the Company's stock fell to $2.99 at close, and continued to plummet to $0.97 at the close of business on February 11, 2019.

14.     At last, on February 12, 2019, the Company issued a report on Form 8-K/A revealing to the public the extent of the Company's misrepresentations. The Company disclosed, in relevant part, that "the Company does not have any formal binding contracts, agreements, or long-term purchase commitments with the City of San Diego."

15.     Subsequently, the price of the Company's common stock tumbled even lower, to close at $0.92 on February 12, 2019.

16.     Despite this, the Company would go on to deny any connection between the false and misleading statements described herein and the resulting drops in the price of the Company's stock, instead blaming the drops on "uncontrollable market conditions," in its annual report filed on April 12, 2019 with the SEC on Form 10-K for the fiscal year ended December 31, 2018.

17.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's financial position and business prospects with the City of San Diego. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false representations to the effect that the Company had entered into a contract with the City of San Diego for the sale of the Company's metal cutting fuel, and made false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company had not entered into any contract with the City of San Diego; (2) the City of San Diego had not adopted the Company's MagneGas2 fuel as its "metal cutting fuel of choice"; (3) the Company's management had caused the Company to enter into a scheme to defraud the public; and (4) the Company had failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

18.     As a result of the Individual Defendants' misconduct, which has subjected

Taronis, its Chief Executive Officer, its former Chief Technology Officer ("CTO"), the Chairman of the Board, the current members of the Board, and one former member of the Board to being named as defendants in a federal securities fraud class action lawsuit filed in the United States District Court for the District of Arizona (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who benefitted from the wrongdoing alleged herein, the Company has and will have to expend many millions of dollars.

19.     In light of the Individual Defendants' misconduct, the substantial likelihood of the directors' liability in this derivative action, and the substantial likelihood of each of the Individual Defendants' liability in the Securities Class Action, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action.

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because the Company's principal executive offices are located in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

# PARTIES

## Plaintiff

24.     Plaintiff is a current shareholder of Taronis common stock. Plaintiff has continuously held Taronis common stock at all relevant times. Plaintiff is a citizen of Montana.

## Nominal Defendant

25.     Nominal Defendant Taronis is a Delaware corporation with principal executive offices located at 300 W. Clarendon Avenue, Suite 230, Phoenix, AZ 85013.

26.     The Company's shares trade on NASDAQ under the ticker symbol "TRNX."

## Defendant Mahoney

27.     Defendant Scott Mahoney ("Mahoney") has served as the Company's CEO and as a member of the Board since November 2018. He previously served as the Company's Chief Financial Officer ("CFO") and Secretary. According to the Company's Schedule 14A filed with the SEC on July 29, 2019 (the "2019 Proxy Statement"), as of July 18, 2019, Defendant Mahoney beneficially owned 504,750 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 18, 2019 was $1.60, Defendant Mahoney owned approximately $807,600 worth of Taronis stock.

28.     For the fiscal year ended December 31, 2018, Defendant Mahoney received $283,452 in compensation from the Company. This included $215,000 in salary, $16,000 in stock awards, and $52,452 in all other compensation.

29.     The 2019 Proxy Statement stated the following about Defendant Mahoney:

**Scott Mahoney, 44,** has served as our Chief Executive Officer and a member of our Board of Directors since November 2018. He previously served as our Chief Financial Officer and Secretary since December 2016. Mr. Mahoney has 17 years of financial and distressed situation management experience. Prior to joining Taronis, Mr. Mahoney was the Chief Financial Officer of Phoenix Group Metals, LLC, a leading auto core supply and automobile recycling company based in Phoenix, AZ. In addition, Mr.

Mahoney has served in several entrepreneurial roles in the oil industry, raising over $200 million in equity and debt capital for previous projects in the Permian Basin, Eagle Ford, Williston Basin, Rockies and Mid-continent. Mr. Mahoney has managed 13 oil and gas acquisitions, and managed or participated in more than 350 oil and gas wells. Prior to co-founding Vast, Mr. Mahoney was the Chief Financial Officer of American Standard Energy Corp, building that company from a start-up to a $400 million market capitalization in two years.

Prior to American Standard, Mr. Mahoney founded Catalyst Corporate Solutions, a financial consulting firm focused on turnaround management in the heavy industrial, business services and oil and gas industries. Under that firm, Mr. Mahoney served as a strategic advisor to XOG Operating, LLC, a contract operator in 17 states and Geronimo Holding Corporation, a portfolio of oil and gas assets in the Permian Basin, Williston Basin, Eagle Ford, South Texas, among other holdings. Mr. Mahoney also advised a number of southwest-based companies on restructuring, debt and equity financings, acquisitions and the sale of multiple businesses. He has extensive experience in the technology, heavy manufacturing, recycling and transportation and construction industries through both his banking and consulting client base. Prior to forming Catalyst, Mr. Mahoney spent 13 years in corporate and investment banking with JP Morgan, Wells Fargo and Key Bank. Mr. Mahoney is a Chartered Financial Analyst and has an MBA from the Thunderbird School of Global Management and two Bachelor's degrees from the University of New Hampshire.

Mr. Mahoney's qualifications to serve on our Board include his financial and management experience.

30.     Upon information and belief, Defendant Mahoney is a citizen of Arizona.

**Defendant Dingess**

31.     Defendant Robert L. Dingess ("Dingess") has served as the Company's Chairman of the Board since April 2013. He also serves as the Chair of the Audit Committee and as a member of the Corporate Governance and Nominating Committee. According to the 2019 Proxy Statement, as of July 18, 2019, Defendant Dingess beneficially owned 169,738 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 18, 2019 was $1.60, Defendant Dingess owned approximately $271,580 worth of Taronis stock.

32.     For the fiscal year ended December 31, 2018, Defendant Dingess received $136,250 in compensation from the Company, which consisted entirely of fees earned or cash paid.

33.     The 2019 Proxy Statement stated the following about Defendant Dingess:

**Robert L. Dingess, 72,** has served as Chairman of our Board of Directors since April 30, 2013. Mr. Dingess has over 35 years of financial and management experience, including working with several large healthcare organizations, owning and operating his own businesses, and serving as a Senior Manager and Partner of Ernst & Young. Mr. Dingess currently is owner and Chief Executive Officer of Ideal Management Services, Inc., d/b/a Ideal Image Central Florida, a med-spa company with four locations in central Florida. From 1992 to 2002, Mr. Dingess served as the Chief Executive and owner of Dingess & Associates, Inc., a private healthcare consulting and management company, which served healthcare clients in multiple states. From 1986 to 1992, Mr. Dingess was a Senior Manager and Partner in Ernst & Young's Southeast Region Healthcare Operations Business Office Practice, where he advised over 200 healthcare clients in healthcare financial management. Mr. Dingess holds a Master of Business Administration from Virginia Commonwealth University and a Bachelor of Business Administration from Marshall University.

Mr. Dingess' experience in owning and operating his own businesses, serving as a Partner at Ernst & Young and in advising companies give him the qualifications and skills to serve as a Director of our Company.

34.     Upon information and belief, Defendant Dingess is a citizen of Arizona.

**Defendant Pollack**

35.     Defendant Kevin Pollack ("Pollack") has served as a member of the Board since June 2012. He also serves as the Chair of the Acquisition Committee and the Corporate Governance and Nominating Committee, and as a member of the Audit Committee and the Compensation Committee. According to the 2019 Proxy Statement, as of July 18, 2019, Defendant Pollack beneficially owned 167,064 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 18, 2019 was $1.60, Defendant Pollack owned approximately $267,302 worth of Taronis stock.

36.     For the fiscal year ended December 31, 2018, Defendant Pollack received $115,625 in compensation from the Company, which consisted entirely of fees earned or cash paid.

37.     The 2019 Proxy Statement stated the following about Defendant Pollack:

**Kevin Pollack, 48,** has served as a Director since June 21, 2012. Mr. Pollack served as Chief Financial Officer of Opiant Pharmaceuticals, Inc. (NASDAQ: OPNT), a specialty pharmaceutical company, and as a member of its Board of Directors, from 2012 until 2017, and as an advisor from 2017 until 2018. From 2007 until 2013, Mr. Pollack was a managing director at Paragon Capital LP, a private investment firm focused primarily on U.S.-listed companies. Since 2003, Mr. Pollack has also served as president of Short Hills Capital LLC. Prior to that, Mr. Pollack worked as an investment banker at Banc of America Securities LLC, focusing on mergers and acquisitions and corporate finance. Mr. Pollack started his career at Sidley Austin LLP (formerly Brown & Wood LLP) as a securities attorney. Since 2012, Mr. Pollack has served as a member of the board of directors of PressureBioSciences, Inc. (OTCQB: PBIO). Mr. Pollack graduated magna cum laude from the Wharton School of the University of Pennsylvania and received a dual J.D./M.B.A. from Vanderbilt University, where he graduated with Beta Gamma Sigma honors.

Mr. Pollack's qualifications to serve on our Board include his financial, legal, investment and management experience, including his experience with other public companies.

38.     Upon information and belief, Defendant Pollack is a citizen of Florida.

**Defendant Santilli**

39.     Defendant Ermanno P. Santilli ("Santilli") served as the Company's CTO and as a member of the Board from June 2012 until his termination as CTO on June 19, 2019 and his resignation from the Board on July 23, 2019. He also served as the Company's CEO from June 2012 until November 2018. According to the 2019 Proxy Statement, as of July 18, 2019, Defendant Santilli beneficially owned 53,876 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 18, 2019 was $1.60, Defendant Santilli owned approximately $86,201 worth of Taronis stock.

40.     For the fiscal year ended December 31, 2018, Defendant Santilli received $271,147 in compensation from the Company. This included $226,697 in salary, $25,000 in bonus compensation, and $19,450 in stock awards.

41.     The 2019 Proxy Statement stated the following about Defendant Santilli:

**Ermanno P. Santilli, 49,** has served as a member of our Board of Directors since June 21, 2012 and served as our Chief Executive Officer from June 2012 until November 2018. Prior to his current role as Chief Technology Officer, Mr. Santilli was our Executive Vice President of International Relations. Mr. Santilli was employed by Ingersoll Rand Company from March 2008 to April 2009 where he served as Vice President of Climate Control Business, Global Rail and Aftermarket. In this capacity, he oversaw a department that generated over $270 million in sales and $80 million in operating income. He managed sales, business development, product management, and warehousing and dealer development with indirect procurement, manufacturing and engineering. Mr. Santilli also drove development of new business and rail markets in Australia and India.

From March 2006 to February 2008, Mr. Santilli served as Vice-President of Climate Control Aftermarket EMEA, where he led a department that generated total sales of $150 million and operating income of $50 million. He was responsible for business development, product management, warehousing, procurement, engineering and dealer development with indirect sales. From December 2003 to February 2006, Mr. Santilli served as Vice-President of Customer Relations for Climate Control EMEA. He had operational responsibility for customer satisfaction for customers with total sales aggregating over 1 billion dollars. Mr. Santilli had direct responsibility for order management, credit and collections, warranty, business intelligence and dealer development.

Mr. Santilli's qualifications to serve on our Board include his financial and management experience.

42.     Upon information and belief, Defendant Santilli is a citizen of Florida.

**Defendant Staunton**

43.     Defendant William W. Staunton ("Staunton") has served as a member of the Board since April 2013. He also serves as the chair of the Compensation Committee and as a member of the Audit Committee and Acquisition Committee. According to the 2019

11

Proxy Statement, as of July 18, 2019, Defendant Staunton beneficially owned 167,005 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 18, 2019 was $1.60, Defendant Staunton owned approximately $267,208 worth of Taronis stock.

44.     For the fiscal year ended December 31, 2018, Defendant Staunton received $99,750 in compensation from the Company, which consisted entirely of fees earned or cash paid.

45.     The 2019 Proxy Statement stated the following about Defendant Staunton:

**William W. Staunton III, 71,** has served as a member of our Board of Directors since April 30, 2013. He is the CEO and Chairman of Okika Technologies, an electronics design services company specializing in custom integrated circuit (IC), firmware, and software solutions. He has been the President of Accel–RF Corporation, a provider of RF Reliability Test Systems for compound semiconductor devices from 2011 until 2013. In 2011, Mr. Staunton founded Kokua Executives, LLC, which provides guidance and interim executive level-leadership to companies. From 2000 to 2011, Mr. Staunton served as the Chief Executive Officer and a Director of Ramtron International Corporation, which designs, develops and markets specialized semiconductor memory, microcontroller, and integrated semiconductor solutions. From March 1999 until December 2000, Mr. Staunton served as Chief Operating Officer of Maxwell Technologies, which designs and manufactures multi-chip modules and board products for commercial satellite applications. Previously, Mr. Staunton was executive vice president of Valor Electronics Inc. from April 1996 until February 1999. Mr. Staunton holds a Bachelor of Science degree in electrical engineering from Utah State University.

Mr. Staunton's extensive experience in the semi-conductor industry, with specific background in Military and Space Contracting, give him the qualifications and skills to serve as a director of our Company.

46.     Upon information and belief, Defendant Staunton is a citizen of California.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

47.     By reason of their positions as officers, directors and/or fiduciaries of Taronis and because of their ability to control the business and corporate affairs of Taronis,

the Individual Defendants owed Taronis and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Taronis in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Taronis and its shareholders so as to benefit all shareholders equally.

48.     Each director and officer of the Company owes to Taronis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Taronis, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of Taronis were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Taronis, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Taronis' Board at all relevant times.

52.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on NASDAQ, the Individual Defendants had a duty not to effect and to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's financials and business operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC accurate information based on the applicable accounting standards, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     To discharge their duties, the officers and directors of Taronis were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Taronis were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, the United States, and pursuant to Taronis' own Code of Business Conduct and Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Taronis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of Taronis and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Taronis' operations would comply with all laws and Taronis' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.  Each of the Individual Defendants further owed to Taronis and the shareholders the duty of loyalty requiring that each favor Taronis' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

55.  At all times relevant hereto, the Individual Defendants were the agents of each other and of Taronis and were at all times acting within the course and scope of such agency.

56.     Because of their advisory, executive, managerial, and directorial positions with Taronis, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Taronis.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitiveness, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Taronis was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered

substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Taronis, and was at all times acting within the course and scope of such agency.

## **CODE OF ETHICS**

63.     The conduct of all of the Company's officers, directors, and employees is governed by the Company's Code of Business Conduct and Ethics (the "Code of Ethics").

64.     The Introduction to the Code of Ethics states that "all directors, officers and employees of the Company are expected to read and understand this Code, uphold these standards in day-to-day activities, comply with all applicable policies and procedures, and ensure that all agents and contractors are aware of, understand and adhere to these standards."

65.     The Code of Ethics provides, as to compliance with applicable laws, that:

> Each director, officer, employee, agent and contractor must comply with all applicable laws, regulations, rules and regulatory orders. Company directors, officers and employees located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act and the U.S. Export Control Act, in addition to applicable local laws. Each director, officer, employee, agent and contractor must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to recognize potential dangers and to know when to seek advice from the CEO on Company specific policies and procedures. Violations of law, regulation, rules and orders may subject a director, officer, employee, agent or contractor to criminal or civil liability, as well as to discipline by the Company. Such violations may also subject the Company to civil or criminal liability or the loss of business.

66.     The Code of Ethics Provides, with respect to use of the Company's assets, that:

> Protecting the Company's assets is the fiduciary responsibility of every director, officer, employee, agent and contractor. Care should be taken to ensure that assets are not misappropriated, loaned, disposed of, sold or donated, without appropriate authorization. All directors, officers, employees, agents and contractors are responsible for the proper use and supervision of Company assets, and must safeguard such assets against loss, damage, misuse or theft. Directors, officers, employees, agents or contractors who violate any aspect of this policy or who demonstrate poor judgment in the manner in which they use any Company asset may be subject to disciplinary action, up to and including termination of employment or business relationship at the Company's sole discretion. Company assets are to be used for Company business purposes only. Directors, officers, employees, agents and contractors may not use Company assets for personal use, nor may they allow any other person to use Company assets. All questions regarding this policy should be brought to the attention of the CEO.

67.     The Code of Ethics Provides, with respect to maintenance and management of the Company's records, that:

> The purpose of this policy is to set forth and convey the Company's business and legal requirements in managing records, including all recorded information regardless of medium or characteristics. Records include, but are not limited to, paper documents, USB's, CDs, computer hard disks, email, floppy disks, microfilm or all other media. Local, state, federal, foreign and other applicable laws, rules and regulations require the Company to retain certain records and to follow specific guidelines in managing its records. Civil and criminal penalties for failure to comply with such guidelines can be severe for directors, officers, employees, agents, contractors and the Company, and failure to comply with such guidelines may subject the director, officer, employee, agent or contractor to disciplinary action, up to and including termination of employment or business relationship at the Company's sole discretion. All original executed documents that evidence contractual commitments or other obligations of the Company must be forwarded to the CEO promptly upon completion. Such documents will be maintained and retained in accordance with the Company's record retention policies.

68.     The Code of Ethics Provides, with respect to customer relationships, that:

> Each time a director, officer or employee comes into contact with any Company customers or potential customers, that director, officer or employee represents the Company and should act in a manner that creates value for the Company's customers and helps to build a relationship based upon trust. The Company and its employees have provided products and services for many years and have built up significant goodwill over that time. This goodwill is one of our most important assets, and the Company employees, agents and contractors must act to preserve and enhance our reputation.

69.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their other schemes described herein, including to facilitate and disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment. In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, protect corporate assets, engage in fair dealing, and ensure full, fair, accurate, timely and understandable disclosures in SEC filings and public statements.

### INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

70.     Taronis is a technology company that purports to offer "technology solutions to today's renewable fuels and sterilization problems." Taronis' two primary product offerings are MagneGas, a hydrogen-based cutting fuel, and the "Plasma Arc Flow system," a patented technology used for fuel gasification and water decontamination/sterilization.

71.     Prior to January 31, 2019, Taronis was known as MagneGas Applied Technology Solutions, Inc.

72.     On May 7, 2018, the Company was informed by NASDAQ that the price of

the Company's common stock had fallen below $1.00, the minimum bid price on NASDAQ. The Company was given a 180-day period, ending on November 5, 2018 to raise its stock price above $1.00 for at least 10 consecutive business days, in order to regain compliance with NASDAQ Marketplace Rule 5550(a)(2) ("Rule 5550(a)(2)"). If the Company failed to do so, the Company would be delisted, and Company stock would cease to be traded on NASDAQ.

73.     In October 2018, the Board determined that the Company would not be able to regain compliance with Rule 5550(a)(2) by the November 5, 2018 deadline. Subsequently, the Company submitted to NASDAQ a request for an additional 180 days for the Company to regain compliance, which NASDAQ granted on November 6, 2018, extending the deadline to May 6, 2019.

74.     The Company disclosed these facts in a Schedule 14C Definitive Information Statement filed with the SEC on November 13, 2018 (the "2018 Information Statement").

75.     The 2018 Information Statement also stated that the Board, with the approval of the Company's then majority shareholder, determined that it would be in the Company's best interest to enact a reverse split of the Company's common stock, in order to raise the Company's share price above NASDAQ's $1.00 minimum. The 2018 Information Statement stated that if a reverse split was not enacted, the Board believed that the Company's stock would be delisted, which would have a "negative impact on the liquidity and market price of the common stock," and could "adversely affect MagneGas's relationships with vendors and customers who may perceive MagneGas's business less favorably."

76.     A reverse stock split is an action taken by a publicly traded company's management, subject to shareholder approval, in which the company's existing shares are consolidated into fewer, more valuable shares. Reverse stock splits are typically enacted when a company's stock has lost significant value and is one of the traditional corporate finance methods used to raise the price of company stock.

77.     Between November 6, 2018 and January 1, 2019, the average price of the Company's stock was $0.28. The price of the Company's stock dropped even further between January 1, 2019 and January 27, 2019, with an average price of $0.21 during that period.

78.     During this time, the Individual Defendants devised, as an additional means of inflating the value of the Company's stock, a fraudulent scheme to make false and misleading statements concerning a nonexistent contract between the Company and the City of San Diego for the sale of MagneGas2, a variant of the Company's MagneGas cutting fuel.

79.     To implement this scheme, on January 28, 2019, the Company disseminated the January 28 Press Release, which touted this purported contract. Unsuprisingly, as the publicized parties to this fabricated contract, City of San Diego officials were taken aback by the January 28 Press Release and its blatant misrepresentation.

80.     On January 29, 2019, the Senior Public Information Officer for the City of San Diego (the "Senior Public Information Officer") contacted the Communications Department Director for the City of San Diego (the "Communications Department Director") to discuss the January 28 Press Release.[2]

81.     In an email sent by the Communications Department Director to the Senior Public Information Officer on January 29, 2019, the Communications Department Director stated, in relevant part, that "[t]he [Taronis] news release ... is incorrect. The City of San Diego does NOT have a contract with this company. … This is appalling that they'd get this so wrong." Exhibit A at 1.

82.     As part of a similar email exchange that day between the Senior Public Information Officer and the Deputy Director of Fleet Operations for the City of San Diego (the "Deputy Director"), the Deputy Director stated that "[w]e have not yet committed and by no means is there any contract with MagneGas." *Id.* at 2.

---

[2] Attached hereto as Exhibit A is a record of internal emails exchanged between City of San Diego officials regarding the January 28 Press Release.

83.     With respect to the Company's MagneGas2 cutting fuel, the Deputy Director stated via email, in relevant part:

> We have demo'd the product as a replacement for the oxygen and acetylene setup we currently use for our metal cutting torches.  Preliminary evaluation shows a cost savings on the gas and improved performance.  It would require a different regulator than the oxy/actyl combo and we are in the process of getting a total count and cost for the replacements.

*Id.*

84.     The same day, the Senior Public Information Officer privately contacted Edison Advisors, the Company's investor relations agency, to demand that the Company withdraw the January 28 Press Release.[3] As part of an email exchange with Edison Advisors, the Senior Public Information Officer stated, in relevant part:

> Thank you for speaking with me and agreeing to immediately remove the erroneous news release locate[d] here: https://globenewswire.com/news-release/2019/01/28/1706316/0/en/   City-of-San-Diego-Adopts-MagneGas-Metal-Cutting-Fuel.html? print=1. As discussed, while the product has been tested, the City of San Diego does not have any procurement contract or any agreement with MagneGas Applied Technology Solutions, Inc. to purchase any of its products. If we receive any media inquiries regarding, I will ask that a retraction be issued as well.

Exhibit B at 2.

85.     In response, Edison Advisors stated, "[t]hanks again, we apologize for any inconvenience and we've begun the process of retraction. Additionally, I've copied in MagneGas' CEO Scott Mahoney, who will actually be in San Diego next Tuesday (Feb. 5) and is interested to meet with you and discuss your existing relationship with MagneGas and what you would be comfortable with us disclosing going forward." *Id.*

86.     After this exchange, the January 28 Press Release was removed from the Company's website. However, the Company did not remove the January 28 Press Release

---

[3] Attached hereto as Exhibit B is a record of emails exchanged between City of San Diego officials, Edison Advisors personnel, and Defendant Mahoney regarding the January 28 Press Release.

from any other source in which it was published, nor did the Company timely file corrective disclosures with the SEC.

87.     On January 29, 2019, the Company enacted the proposed reverse stock split. On that date, the Company amended its certificate of incorporation to provide that every 20 shares of the Company's outstanding common stock would become 1 share of common stock, effective on January 30, 2019 at the close of business.

88.     This caused the price of the Company's stock to swell to $4.20 at the close of business on January 31, 2019.[4]

89.     On January 31, 2019, the Senior Public Information Officer contacted both Edison Advisors and Defendant Mahoney, informing them that an article containing the January 28 Press Release was still available on the *Global Newswire* website, at https://www.globenewswire.com/news-release/2019/01/28/1706316/0/en/City-of-San-Diego-Adopts-MagneGas-Metal-Cutting-Fuel.html (last visited September 12, 2019). In response, Defendant Mahoney stated via email that "[i]t was taken off th[e] site the day you requested. I will follow up to ensure that has happened as requested." Exhibit B at 1.

90.     That same day, the Company changed its name to Taronis Technologies, Inc.

91.     The January 28 Press Release was not removed from the *Global Newswire* website, and remains accessible there.

**False and Misleading Statements**

***January 28, 2019 8-K***

92.     On January 28, 2019, the Company filed the January 28 8-K with the SEC, which was signed by Defendant Mahoney, and was reviewed and approved by the other Individual Defendants.

93.     The January 28 8-K claimed that the City of San Diego had contracted with the Company to use MagneGas2 as the city's "metal cutting fuel of choice." The January

---

[4] Adjusted for the Company's 20:1 reverse stock split at the close of business on January 30, 2019.

28 8-K further claimed that this marked "the first major city contract for the adoption of [the Company's] metal cutting fuels."

### *January 28, 2019 Press Release*

94.     That same day, the Company issued the January 28 Press Release to address the purported contract with the City of San Diego, a copy of which was attached with the January 28 8-K. The January 28 Press Release was also published in a number of regional newspapers and online news sources. The January 28 Press Release stated the following:

#### City of San Diego Adopts MagneGas Metal Cutting Fuel

*Major New Client Win Southern California*

TAMPA, Fla., Jan. 28, 2019 -- MagneGas Applied Technology Solutions, Inc. ("MagneGas" or the "Company") (NASDAQ: MNGA), a leading clean technology company in the renewable resources and environmental solutions industries, announced today that the City of San Diego has elected to use MagneGas as its metal cutting fuel of choice, marking the first major city contract for the adoption of our metal cutting fuels.  The City of San Diego has historically used acetylene to maintain a wide range of equipment used for waste removal, maintenance and infrastructure support and as of this contract, the City will immediately begin adoption of MagneGas' cleaner and safer fuel products. In addition, the San Diego Continuing Education Cultural Complex ("ECC") has elected to begin using MagneGas for the training and recertification of welders in the southern California market.

"We are grateful for the opportunity to serve the City of San Diego and the San Diego Continuing Education Cultural Complex," commented Scott Mahoney, Chief Executive Officer of MagneGas.  "We have been steadily marketing our propriety metal cutting fuel for one year since acquiring Complete Welding of San Diego in January of last year."

"We have been presenting our unique capabilities through periodic live demonstrations of our technology, and we have been patiently supporting the local market as we gained the trust and confidence of some of the largest consumers of metal cutting fuels in the southern California market.  The City of San Diego's decision to adopt our product is a major milestone in our growth efforts in California."

Mr. Mahoney concluded, "We are also very proud of our new relationship with the San Diego Continuing Education Cultural Complex.  This is one of the premier training and recertification centers for welders in southern California, and we're proud to help shape this aspect of the curriculum going forward.  This relationship will quickly serve as a powerful platform for promoting our products and building new client relationships across the southern part of the state. Being deeply involved in the educational aspect of this industry is strategically important because we have the responsibility to train the next generation of welders on the newest and safest technologies and have them carry it forward in their careers."

95.     Following the release of the January 28 8-K and Press Release, the value of the Company's stock soared over the next two days, to close at $4.94 per share on January 30, 2019.[5] This represented an increase of nearly 25% over the $4.00 per share price of the Company's stock at close on January 25, 2019, the last business day prior to January 28, 2019.[6]

***January 31, 2019 Conference Call***

96.     On January 31, 2019, the Company held a conference call to discuss the Company's business strategy (the "January 31 Conference Call"). During the call, a number of investors questioned Defendant Mahoney about the purported contract with the City of San Diego described in the January 28 8-K and Press Release.

97.     During the January 31 Conference Call, a private investor made the following statements to Defendant Mahoney:

I just want to say another thing your investors need to hear is now that you've got into municipalities, the door has been opened and I sell a lot of our company's products to municipalities all over the United States, and once you got your foot in the door with one, others listen and will take heed to the success that San Diego is gonna have with your product. So we have – you just have a tremendous potential with growth and I look forward to it and you have a great product and a great team and anything I can do to help,

---

[5] Adjusted for the Company's 20:1 reverse stock split at the close of business on January 30, 2019.

[6] Adjusted for the Company's 20:1 reverse stock split at the close of business on January 30, 2019.

I will be glad to help.

98.    In response, Defendant Mahoney stated, "[t]hank you."

99.    Also during the Conference Call, a financial consultant asked Defendant Mahoney the following questions:

> I was wondering if you guys are looking into emerging markets such as Georgia or the Balkans where there's also LNG facilities that are being built that are significant to European energy security and significant ports located in those two hubs. As also if domestically you are working with for the metal cutting, if you are working with unions at all like the metalworkers?

100.    Defendant Mahoney responded as follows:

> Ok. So let me answer the second question first because it actually ties in to what Fred's question was just a minute ago. So when you look at the disclosures that were shared the other day on Monday [(January 28, 2019)], I think a lot of people overlooked the school that was highlighted. That's extremely important because that ties into sort of the same concept as working with the unions.

101.    The statements referenced in ¶¶92–94, 96, 98, and 100 were materially false and/or misleading because they falsely represented that the Company had entered into a contract with the City of San Diego for the sale of the Company's metal cutting fuel, and failed to disclose, *inter alia*, that: (1) the Company had not entered into any contract with the City of San Diego; (2) the City of San Diego had not adopted the Company's MagneGas2 fuel as its "metal cutting fuel of choice"; (3) the Company's management had caused the Company to enter into a scheme to defraud the public; and (4) the Company had failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

102.    After the January 28 Press Release was pulled from the Company's website, uncertainty began to circulate among investors as to whether the Company had actually

1    entered into a contract with the City of San Diego.

2        103.    On January 30, 2019, one such investor wrote to the Company's Twitter

3    account, saying, "[t]here is already a filing of the San Diego deal. The announcement on

4    the website disappeared though AND there is none on twitter yet. What happened? [W]as

5    it an unintentional/premature/leaked announcement you planned to announce later this

6    week (tomorrow)??"

7        104.    On February 1, 2019, the price of the Company's stock fell to $2.99 at the

8    close of business, down from $4.20 at the close of business on January 31, 2019. By the

9    close of business on February 11, 2019, the price of the Company's stock had plummeted

10   to a low point of $0.97. [7]

11       105.    On February 11, 2019, another investor commented on a statement made by

12   the Company's Twitter account, stating, "[t]his company was Magn[e]Gas, they changed

13   names due to their bad reputation of reverse splits & ripping off retail investors. I was told

14   they published news that they signed a deal with the city of San Diego & the mayor made

15   them take down the news because it wasn't true. Beware.."

16       106.    On February 12, 2019, eleven business days after the Company had issued

17   the January 28 8-K and Press Release, the Company filed a report with the SEC on Form

18   8-K/A (the "February 12 8-K/A") that at last revealed to the public that the Company did

19   not have "any formal binding contracts, agreements, or long-term purchase commitments

20   with the City of San Diego." The February 12 8-K/A, which was signed by Defendant

21   Mahoney, and was reviewed and approved by the other Individual Defendants, stated, in

22   relevant part:

23       On January 28, 2019, Taronis Technologies, Inc., formerly known as
         MagneGas Applied Technology Solutions, Inc. (the "Company") issued a
24       press release and filed a corresponding Current Report on Form 8−K with
         the SEC, which stated that the City of San Diego had elected to use
25       MagneGas2 as its metal cutting fuel of choice and that this was the first
26

27   _____
     [7] Adjusted for the Company's 20:1 reverse stock split at the close of business on January
28   30, 2019.

major city contract for the adoption of the Company's metal cutting fuels. ***The Company has determined that it is necessary to correct its prior disclosure.*** The Company has an approval and a written authorization from the City of San Diego's Fleet Operations to move forward with the procurement of gas and other hard goods from the Company at three different locations within the City. This procurement covers more than one division within the municipality, and was received from a city official with sufficient authority to approve the procurement process. In the welding supply and gas distribution business purchases and sales of hard goods and gases are typically made through a process whereby a purchaser receives a quote for goods from the seller and then places an order which is later memorialized in a purchase order. The Company treats purchase orders as contracts and made its prior disclosure with that treatment in view, ***however, the Company does not have any formal binding contracts, agreements or long−term purchase commitments with the City of San Diego beyond the existing approval, nor any commitment that any of the Company's products will be purchased as the products of choice for their respective applications.***

(Emphasis added).

107.     However, the Company did not have "an approval and a written authorization from the City of San Diego's Fleet Operations to move forward with the procurement of gas and other hard goods from the Company at three different locations within the City," rendering even this disclosure false and misleading. *See* Exhibit B at 2.

108.     The fact that no "approval" or "written authorization" existed is further evidenced by a February 7, 2019 email from the City of San Diego Fleet Operations Fleet Manager to the Company, which stated, in relevant part, "[t]he last thing that I would like from you before we move forward is a guarantee of availability of the Magnegas product, a proof of environmental impact, and the cost savings that we will see versus the acetylene product. This will be an important part in justifying the switch in addition to the time saving part the product provides. If there is someone from Magnegas that you would like to put me in touch with, that would be fine as well."[8] Exhibit C at 1.

---

[8] Attached hereto as Exhibit C is a record of emails exchanged between the City of San Diego Fleet Operations Fleet Manager and a Company representative.

109. The price of the Company's stock remained abysmally low following the release of the February 12 8-K/A, dropping to $0.92 at the close of business on February 12, 2019, down from $0.97 at the close of business on February 11, 2019.

110. On June 19, 2019, the Company fired Defendant Santilli from his position as CTO of the Company.

111. Nearly a year after these disclosures were made, however, the Company went on to deny any connection between the false and misleading statements described herein and the drops in the price of the Company's stock after the reverse stock split effectuated on January 30, 2019.

112. Specifically, the Company's annual report filed with the SEC on Form 10-K for the fiscal year ended December 31, 2018, which was signed by Defendant Mahoney, stated that "[a]lthough the Company effected the Reverse Stock Split as of January 30, 2019 at 5p.m. Eastern Time, the price of our Common Stock subsequently fell below $1.00 due to *uncontrollable market conditions* prior to having traded above $1.00 for the minimum ten consecutive business days required to regain compliance." (Emphasis added).

113. In reality, the Company's stock price did not fall because of "uncontrollable market conditions." Rather, it fell as a result of the public discovering the truth behind the false and misleading statements disseminated by the Company, at the behest of the Individual Defendants, concerning the Company's fabricated contract with the City of San Diego.

114. On August 19, 2019, the Company held a conference call to discuss its earnings for the fiscal quarter ended June 30, 2019, during which Defendant Mahoney further mischaracterized the nature of the false and misleading statements described herein.

115. During the August 19, 2019 conference call, Defendant Mahoney stated, in relevant part:

So we had a purchase order from three different departments from the city

of San Diego. We asked consent from the guy that we had the written purchase contracts from to use their name and go ahead and let them know or let everybody know that we had won a new customer.

And when that went out, someone upstairs got a call from the incumbent provider, who is all bent out of shape, it's one of the big guys, and said hey, are you guys switching everything you do? Meaning, buying things other than our MagneGas. So, buying wire, or welding equipment, or protective gear. I mean this was a contract for like hundreds of thousands of dollars. So guy said no, we are just buying some MagneGas.

We like the product. I mean, like well, if you guys don't make him take that press release down we're going to stop doing business with you, and we're going to say that you breached your other purchase agreements. So if I'm selling him MagneGas, it has nothing to do with him buying some welding equipment, right? The other guy tied it and said -- the other guy said, you have to basically make them take the press release down.

So as a courtesy to a customer, we took the press release down. That's it.

116.    As the exchanges between the Company and the City of San Diego officials described herein make clear, there were no purchase contracts between the Company and the City of San Diego on January 28, 2019, and the Company did not take down the January 28 Press Release "as a courtesy to a customer." *See* Exhibit A at 2.

## **DAMAGES TO TARONIS**

117.    As a direct and proximate result of the Individual Defendants' conduct, Taronis will lose and expend many millions of dollars.

118.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and each of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

119.    Such expenditures will also include costs incurred in any internal investigations pertaining to breaches of fiduciary duty and violations of law, costs incurred in defending any investigations or legal actions taken against the Company due

to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

120.    As a direct and proximate result of the Individual Defendants' conduct, Taronis has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

121.    Plaintiff brings this action derivatively and for the benefit of Taronis to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Taronis and unjust enrichment, as well as the aiding and abetting thereof.

122.    Taronis is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff is, and at all relevant times has been, a Taronis shareholder. Plaintiff will adequately and fairly represent the interests of Taronis in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY ALLEGATIONS**

124.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

125.    A pre-suit demand on the Board of Taronis is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following four Individual Defendants: Defendants Dingess, Mahoney, Pollack, and Staunton (the "Directors"). Plaintiff needs only to allege demand futility as to two of the four Directors who are on the Board at the time this action is commenced.

126.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact alleged herein, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

127.    In complete abdication of their fiduciary duties, the current Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and/or omissions alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the current Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

128.    Additional reasons that demand on Defendant Mahoney is futile follow. Defendant Mahoney has served as the Company's CEO and as member of the Board since November 2018, and is thus, as the Company admits, a non-independent director. The Company provides Defendant Mahoney with his principal occupation, and he receives handsome compensation, including $283,452 during the fiscal year ended December 31, 2018. Furthermore, Defendant Mahoney was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including those made in the January 28 8-K and Press Release, and the January 31 Conference Call, which he either personally made or signed off on. Moreover, he was privy to numerous email exchanges with City of San Diego officials regarding the purported contract. As the Company's highest officer and as a trusted director, Defendant Mahoney conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme alleged herein, including to make false and misleading statements and omissions, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Mahoney is a defendant in the Securities Class Action. Thus, for these reasons,

too, Defendant Mahoney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Dingess is futile follow. Defendant Dingess has served as the Company's Chairman of the Board since April 2013. He also serves as the Chair of the Audit Committee and as a member of the Corporate Governance and Nominating Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Dingess is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Dingess breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Pollack is futile follow. Defendant Pollack has served as a member of the Board since June 2012. He also serves as the Chair of the Acquisition Committee and the Corporate Governance and Nominating Committee, and as a member of the Audit Committee and the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Pollack is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Pollack breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Staunton is futile follow. Defendant Staunton has served as a member of the Board since April 2013. He also serves

as the Chair of the Compensation Committee and as a member of the Audit Committee and the Acquisition Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Staunton is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Staunton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on the Board is futile follow.

133.    The Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics requires the Directors to also adhere to Taronis' standards of business conduct. The Directors did not comply with the requirements of the Code of Ethics. Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

134.    Directors Dingess, Pollack, and Staunton were members of Taronis' Audit Committee during the Relevant Period. These Directors were expressly responsible for oversight of Taronis' financial reporting, internal controls, and compliance with applicable laws and regulations. These Directors' participation in making or causing Taronis to make the materially false and misleading statements alleged herein represents either intentional wrongdoing or reckless disregard for their duties as members of the Audit Committee. Thus, Directors Dingess, Pollack, and Staunton face a substantial likelihood of liability and demand is futile as to them.

135.    Taronis has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt

to recover for Taronis any part of the damages Taronis suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

136.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

137.    The acts complained of herein constitute violations of fiduciary duties owed by Taronis' officers and directors, and these acts are incapable of ratification.

138.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Taronis. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Taronis, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

139.    If there is no directors' and officers' liability insurance, then the Directors will not cause Taronis to sue the Individual Defendants named herein, since, if they did,

they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

140. Thus, for all of the reasons set forth above, all of the current Directors, and, if not all of them, certainly at least two of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

141. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Taronis' business and affairs.

143. Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

144. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Taronis.

145. In breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that falsely represented that the Company had entered into a contract with the City of San Diego for the sale of the Company's metal cutting fuel, and failed to disclose, *inter alia*, that: (1) the Company had not entered into any contract with the City of San Diego; (2) the City of San Diego had not adopted the Company's MagneGas2 fuel as its "metal cutting fuel of choice"; (3) the Company's management had caused the Company to enter into a scheme to defraud the public; and (4) the

Company had failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

146.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

147.    The Individual Defendants had actual or constructive knowledge that the Company violated the law and issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the violations of law, misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Taronis' securities.

148.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Taronis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff on behalf of Taronis has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.    By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Taronis.

152.    The Individual Defendants either benefitted financially from the improper

conduct and received unjustly lucrative bonuses tied to the false and misleading statements and omissions, or received bonuses, stock options, or similar compensation from Taronis that was tied to the performance or artificially inflated valuation of Taronis.

153.    Plaintiff, as a shareholder and a representative of Taronis, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including benefits, stock awards, RSUs and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

154.    Plaintiff on behalf of Taronis has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Abuse of Control

155.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Taronis, for which they are legally responsible.

157.    As a direct and proximate result of the Individual Defendants' abuse of control, Taronis has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Taronis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

158.    Plaintiff on behalf of Taronis has no adequate remedy at law.

### FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and

fiduciary duties with regard to prudently managing the assets and business of Taronis in a manner consistent with the operations of a publicly-held corporation.

161.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Taronis has sustained and will continue to sustain significant damages.

162.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

163.    Plaintiff, on behalf of Taronis, has no adequate remedy at law.

### FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

164.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused Taronis to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

166.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

167.    Plaintiff on behalf of Taronis has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Taronis, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Taronis;

(c)    Determining and awarding to Taronis the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly

and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Taronis and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Taronis and its shareholders from a repeat of the damaging events described herein. The following actions may be necessary to ensure proper corporate governance policies:

1.     a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.     a provision to permit the shareholders of Taronis to nominate at least two candidates for election to the board; and

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Taronis restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

.     .     .

.     .     .

.     .     .

.     .     .

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 20, 2019

**CHRISTIAN GOODMAN PLC**

By: _/s/ James S. Christian_
      James S. Christian, State Bar No. 023614
      5050 North 40th Street
      Suite 320
      Phoenix, Arizona 85018
      Telephone:  (602) 899-4711
      Email:  James@Christian-Goodman.com

      *Liaison Counsel for Plaintiff*

      **THE BROWN LAW FIRM, P.C.**
      Timothy Brown
      240 Townsend Square
      Oyster Bay, New York 11771
      Telephone: (516) 922-5427
      Facsimile: (516) 344-6204
      Email: tbrown@thebrownlawfirm.net

      *Counsel for Plaintiff*

# **VERIFICATION**

I, Chase Manley, am a plaintiff in the within action.  I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2019.

9/16/2019

DocuSigned by:

680D6873E0B5448...

Chase Manley